**STATUTES**

CONSTITUTIONAL LAW — EMERGENCY LEGISLATION —
    "CHANGE IN DUTIES" — TOBACCO REGULATION —
    CHANGE IN DUTIES OF COMMISSIONER OF LABOR AND
    INDUSTRY

March 15, 1995

*The Honorable Parris N. Glendening*
*Governor*

You have requested our opinion on an issue related to House
Bill 1368/Senate Bill 860, "Smoking — Prohibition on Adoption of
Regulations to Restrict Smoking." Specifically, you ask whether
House Bill 1368/Senate Bill 860 may be given effect as an
emergency bill — that is, if the bill is enacted, will it take effect from
the date of enactment?

For the reasons stated below, we conclude that, because House
Bill 1368/Senate Bill 860 changes the duties of the Commissioner of
Labor and Industry, Article XVI, §2 of the Maryland Constitution
does not allow the measure to be an emergency bill. Although this
constitutional limitation has no effect whatever on the substantive
validity of the bill, it will not take effect upon enactment, but instead
on June 1, 1995.

**I**

**House Bill 1368/Senate Bill 860**[1]

House Bill 1368/Senate Bill 860 is emergency legislation for
the purpose, according to its title, "of prohibiting the Secretary of
Licensing and Regulation and the Commissioner of the Division of
Labor and Industry from proposing, adopting, or enforcing any
regulation that restricts smoking or possessing certain tobacco
products under certain circumstances." The bill "generally relat[es]

---

[1] As introduced, these two bills were identical and remain so after
committee amendments.

to the regulatory authority of the Secretary and Commissioner under certain circumstances."

The bill would forbid the Secretary and the Commissioner from proposing or adopting any regulation that restricts the smoking or possession of tobacco products in any restaurant with a liquor license, bars and similar businesses with an on-premises liquor license, hotel or motel, or certain other facilities open to the public.[2] Proposed §2-105(d) of the Business Regulation Article, Maryland Code; proposed §§2-106(c) and 5-314(c) of the Labor and Employment ("LE") Article, Maryland Code. The bill would allow the Secretary and the Commissioner to adopt regulations to require the designation of smoking and non-smoking areas, but the smoking areas under such a regulation may not require the establishment "to modify the structural or atmospheric conditions of the areas ...."

Section 2 of House Bill 1368/Senate Bill 860 states that it "shall be construed retroactively and shall be applied and interpreted to affect any regulations, including COMAR 09.12.23.01 through .05, that have been proposed or adopted by the Secretary of Licensing and Regulation or the Commissioner of Division of Labor and Industry that address the smoking or the possession of tobacco products in establishments affected by this Act." Section 3 of the bill identifies it as "an emergency measure" that "shall take effect from the date it is enacted." Thus, if the bill is passed with the requisite three-fifths majority and your anticipated veto is then overridden, by its terms the bill would take effect from the date of the veto override. *See* Article II, §17 of the Constitution.

---

[2] For brevity's sake, we shall refer to the establishments specified in House Bill 1368/Senate Bill 860 as "the hospitality industry." As amended, the bill also excludes from regulation "any portion of a private residence which is not open to the public for business purposes." Private residences, except to the extent that they have been transformed into businesses, were not encompassed by the Commissioner's July 1994 regulation, discussed in Part III below. *See Fogle v. H & G Restaurant, Inc.*, No. 69, September Term, 1994, 1995 WL 73697, at 30-31 (Md. Feb. 24, 1995).

## II

### Emergency Legislation and a "Change in Duties"

Article XVI, §2 of the Constitution, enacted as part of the Referendum Amendment, imposes certain limitations on expedited law-making through the emergency bill process: "No measure creating or abolishing any office, or changing the salary, term or duty of any officer, or granting any franchise or special privilege, or creating any vested right or interest, shall be enacted as an emergency law."

In construing this or any other constitutional provision, "we seek 'the construction that effectuates the intent of its framers.'... To determine intent, we first examine the language of the provision, 'with each word being given its ordinary and popularly understood meaning.' If the words are not ambiguous, we generally construe the provision to effectuate the clear meaning expressed by its words. If the words are ambiguous, however, we look to other sources to determine the purpose for which the framers included the provision." *Fish Market Nominee Corp. v. G.A.A., Inc.*, 337 Md. 1, 8, 650 A.2d 705 (1994) (quoting *Brown v. Brown*, 287 Md. 273, 277, 412 A.2d 396 (1980)).

The pertinent language here is "changing the salary, term, or duty of any officer ...." The framers of the Referendum Amendment evidently thought that these three elements of a public office were so central to the office that the people, through the referendum process, ought to have the opportunity to block changes in these key attributes.[3] Were there no means to prevent statutes effecting such changes from taking effect immediately, "public and private uncertainty, disorder, and confusion ... would result ...." *Dorsey v. Petrott*, 178 Md. 230, 249, 13 A.2d 630 (1940).

We begin by acknowledging that the language is entirely unambiguous when applied to the salary or term of a public officer – a "change" in a salary or term must mean any increase or decrease from the previous amount of the salary or duration of the term. No

---

[3] The provision in question has been unchanged since its enactment in 1914. *See* Chapter 673, Laws of Maryland 1914 (ratified November 2, 1915). The referendum petition process and its effect are set out in Article XVI, §3.

one could seriously argue, for example, that even a small boost in salary was not a "change."

The same meaning would ordinarily be given to the word "changing" as applied to "duty," as the California Supreme Court explained in construing virtually identical language in the California Constitution:

> We think it will not be contended that the increase or decrease in the salary of an officer is not a change in his salary. It is equally apparent that any increase or diminution in the term of an officer is a change in his term. As the three words "salary," "term," and "duties" not only occur in the same sentence but grammatically are objects of the same participle, "changing," the same meaning must be given the participle when applied to one of these objects as when applied to the others. It is clear, therefore, that when we look at the text in which this phrase appears, the word "changing," when considered in its connection with the words "duties of any officer," must mean any increase or addition to the duties of such officer. In our opinion, no other reasonable construction can be given the word "changing," as used in said section of the Constitution.

*Stockburger v. Jordan,* 76 P.2d 671, 676-77 (1938).[4]

The one Maryland case on point can be read to support this literal construction of the language. In *Hammond v. Lancaster*, 194 Md. 462, 71 A.2d 474 (1950), the Court of Appeals considered a number of objections to the Ober Law, an anti-communist law enacted at the height of the Cold War. Among other things, the Ober Law specified that the Attorney General would have certain enforcement authority against subversive activities. Those challenging the law claimed that this grant of enforcement authority

---

[4] The parallel language of the California Constitution is as follows: "No measure ... changing the salary, term or duties of any officer ... shall be construed to be an urgency measure."

was a change in the duties of the Attorney General that rendered the law improper as an emergency measure.

The Court of Appeals disposed of this argument in a single sentence: "We think, however, that the additional duties imposed upon the Attorney General are well within the general duties of his office under the Constitution." 194 Md. at 477. This statement apparently meant that, because the Attorney General already had certain general enforcement powers under Article V, §3 of the Constitution, the grant by statute of a specifically identified enforcement power amounted to no additional duty at all, and therefore was not a "change" in the Attorney General's duties.[5]

In recognition of the practical difficulty that would be created if every incremental duty, no matter how insignificant, were a bar to emergency legislation, Attorney General Sachs fashioned a broader construction of the constitutional text in the one pertinent opinion of the Attorney General. In 69 *Opinions of the Attorney General* 271 (1984), the issue was whether Article XVI, §2 barred emergency status to a bill that required boards of canvassers to take certain specific steps to safeguard absentee ballots. Relying on a line of California cases after *Stockburger*, the Attorney General opined that "an addition or subtraction in relation to the volume of duties required to be performed by an officer, not substantially affecting the primary duties of the office, is not such a 'change of duties' as would prevent immediate effectiveness of legislation." 69 *Opinions of the Attorney General* at 273. *See Martin v. Riley*, 123 P.2d 488 (Cal. 1942); *Behneman v. Alameda-Contra Costa Transit Dist.*, 6 Cal. Rptr. 382 (Cal. App. 1960). The Attorney General also opined that "a prohibited 'change in duties' did not occur where the legislation simply conferred such additional duties as would naturally devolve on the officer had no express mention been made of them in the measure and as otherwise would be incidental to his office." 69 *Opinions of the Attorney General* at 273. *See Davis v. Los Angeles Co.*, 84 P.2d 1034 (Cal. 1939). Applying this standard, the Attorney General determined that the incidental new requirements, which were really no more than a legislative

_____

[5] *Hammond v. Lancaster* makes it clear that the prohibitory language in Article XVI, §2 applies to discretionary duties as well as mandatory ones. 194 Md. at 477. *See also* 69 *Opinions of the Attorney General* 271, 272 (1984) (rejecting "metaphysical distinctions" among "power," "authority," and "duty").

prescription of sound practices that boards of canvassers were already authorized to adopt, "did not substantially affect the primary duties of the board" and therefore could be enacted in an emergency bill.  69 *Opinions of the Attorney General* at 273.

The approach in the 1984 opinion, while perhaps problematic as a matter of construction,[6] has the merit of practicality and undoubtedly reflects the practice of our office in approving emergency bills that redefined in one way or another the duties of a public officer.  Although we cannot predict with any assurance how the Court of Appeals would now interpret the pertinent language in Article XVI, §2, we shall accept the prior view of our office that the provision does afford some degree of flexibility.

In particular, we should not be taken to suggest that the General Assembly is generally barred from passing emergency bills that modify a regulation previously adopted by an Executive Branch official.  That an official exercises regulatory discretion to achieve one result and the General Assembly then legislates another does not necessarily amount to a "change in duties."

As Attorney General Sachs suggested, the issue is one of degree, requiring a careful comparison of the extent of the official's regulatory authority before the passage of the law in question with the residual authority after its passage.  If, on the one hand, the new law reflects only minor changes or shifts in priority that nevertheless leave substantially unaffected the prior scope of authority, no "change in duties" will have taken place.  But if, on the other hand, the new law significantly diminishes the official's rulemaking authority, the prohibition in Article XVI, §2 applies, even in light of the more relaxed standard set forth in the 1984 opinion.

---

[6] The 1984 opinion in effect requires that different meanings be assigned to the very same word within a single clause – "changing" means *any* increase of a salary or term, but means only a *substantial* increase in an officer's duties.  Such a reading is inconsistent with a well-established canon of statutory construction: "Because the legislature is presumed to use words consistently throughout a particular enactment, the clear meaning imparted to a word in one part of a statute may be ascribed to that word elsewhere in the statute absent a manifest contrary purpose." *Supervisor v. Chase Associates*, 306 Md. 568, 575, 510 A.2d 568 (1986).  Principles of statutory construction apply to the Constitution. *Fish Market Nominee Corp.*, 337 Md. at 8.

In short, neither the 1984 opinion nor any other pertinent authority stands for the proposition that a significant diminution in a public officer's duties can be effected by an emergency bill. As explained in Part III below, that is exactly what House Bill 1368/Senate Bill 860 does.

## III

### Change in Duties of Commissioner of Labor and Industry

Under LE §2-106(b), the Commissioner has authority to "adopt regulations that are necessary to carry out" a number of provisions of the Labor and Employment Article, including LE Title 5, the Maryland Occupational and Safety and Health ("MOSH") Act.[7] The Commissioner cited this grant of authority as the basis for the regulation prohibiting smoking in enclosed workplaces.[8] The Commissioner's authority to do so was upheld by the Court of Appeals in *Fogle v. H & G Restaurant, Inc.*, 337 Md. 441, 654 A.2d 449 (1995). House Bill 1368/Senate Bill 860 truncates this authority by prohibiting the Commissioner from proposing or adopting any regulation to restrict the smoking or possession of tobacco products in hospitality industry establishments.[9]

---

[7] In light of this grant of rulemaking authority and various other grants of authority, there is no doubt that the Commissioner is a public officer. 34 *Opinions of the Attorney General* 176 (1949).

[8] The Commission also cited LE §5-312, which reflects the Commissioner's authority to adopt regulations that are recommended by the Occupational Safety and Health Advisory Board. The workplace smoking regulation was based on a recommendation by the Advisory Board. *See* 21:8 Md. Reg. 682 (April 15, 1994).

[9] Although not relevant to the workplace smoking regulation adopted in July 1994, the Commissioner has authority under LE §5-314(a) to "adopt immediately an emergency occupational safety and health standard that the Commissioner determines is needed to protect employees from the grave danger of ... a new hazard ... or ... exposure to an agent or circumstance determined to be toxic or physically harmful." House Bill 1368/Senate Bill 860 eliminates the Commissioner's authority to act under this provision with respect to smoking or the possession of tobacco products (which might present hazards unrelated to ETS) in any of the designated establishments.

This is no trivial diminution in the Commissioner's duties. The Commissioner began his regulatory action "to protect Maryland employees from the hazards associated with environmental tobacco smoke ('ETS'). Reputable science has established ETS as a cause of lung cancer and coronary heart disease in non-smoking adults.... The workplace is a significant source of exposure to ETS; in Maryland approximately 60% of Marylanders work in locations where smoking is permitted in common work and public areas." 21:8 Md. Reg. 682 (April 15, 1994). At the conclusion of the rulemaking process, the Commissioner determined "that ETS in the workplace is detrimental to employee health and a significant risk to employee health, that the means by which to most adequately ensure, to the extent feasible, that no employee suffers from material impairment of health or functional capacity from exposure to ETS is to require employers to prohibit smoking in enclosed places of employment ...." 21:15 Md. Reg. 1352 (July 22, 1994). In deciding to apply the regulation to restaurants and bars, the Commissioner pointed out that, in the view of the MOSH Advisory Board, "employees in these establishments were among those most in need of protection ...." 21:15 Md. Reg. 1336 (July 22, 1994).

The grant of rulemaking authority to the Commissioner is in furtherance of his general "power and authority to administer and enforce" the MOSH Act. As the Court of Appeals wrote, the "Commissioner is responsible for carrying out the statutory mandate of the MOSH Act, which includes developing and adopting occupational safety and health standards to ensure that Maryland employees labor in safe and healthful working conditions." *H & G Restaurant*, 337 Md. at 447, 654A.2d at 452. Indeed, one of the purposes of the MOSH Act is to "ensure, to the extent practicable, that each working man and woman in the State has working conditions that are safe and healthful...." LE §5-102(b).

Under LE §5-309(c), the MOSH Advisory Board is required to recommend standards related to "toxic materials or harmful physical agents," like ETS, "that most adequately ensure, to the extent feasible on the basis of the best available evidence, that no employee, including an employee who has regular exposure to toxic materials or harmful physical agents during the working life of the employee will suffer material impairment of health or functional capacity." This provision means that once the Board and the Commissioner determine that a hazard like ETS presents a significant risk, they must act to protect workers and to do so in a way that provides workers with the "maximum protection feasible[;

the statute] does not permit [the agency] to engage in cost-benefit analysis." *National Cottonseed Products Ass'n v. Brock*, 825 F.2d 482, 485 n.1 (D.C. Cir. 1987), *cert. denied,* 485 U.S. 1020 (1988) (citing *American Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490 (1981)). This provision thus defines the Commissioner's duty to protect workers from the type of substance at issue by instructing the Commissioner to regulate rigorously.[10]

House Bill 1368/Senate Bill 860 eliminates what had been the statutory duty of the Commissioner to provide the maximum protection possible against ETS for an entire class of employees − those who work in hospitality industry establishments. Although the bill permits a regulation that would require distinct areas for smokers and non-smokers, the bill eliminates, now and in the future, the Commissioner's authority to prevent employee exposure to ETS. The bill prohibits "any requirements to modify the structural or atmospheric conditions of the [smoking] areas of the establishment." The Commissioner has determined that precisely these prohibited safeguards are necessary to protect against the migration of smoke into non-smoking areas. *See* 21:15 Md. Reg. 1348. Having determined that these safeguards are feasible, and having been upheld in this regard by the Court of Appeals, it was his duty under current law to require them.

Nor, under the bill, can the Commissioner bar a hospitality industry employer from requiring an employee to work in a smoking area. *See* COMAR 09.12.23.04B(2). As a result, a waiter or waitress who is required to work in the smoking area would suffer considerable exposure to ETS, contrary to the Commissioner's duty under LE §5-309(c) to protect all employees against health impairment.

---

[10] The Commissioner was sustained by the Court of Appeals in his judgment that the maximum protection − a smoking ban − met the feasibility prerequisite for the hospitality industry as for other employers. "Feasible" means "technologically and economically capable of being done." *H & G Restaurant*, 337 Md. at 461, 654 A.2d at 459.

In our opinion, House Bill 1368/Senate Bill 860 materially decreases, and thus changes, the duties of the Commissioner.[11]  The bill does more than reorder the details of a regulatory scheme.  Instead, in the words of the 1984 opinion, it "substantially affect[s] the primary duties of the office ...."  The bill says to the Commissioner that he may no longer do for more than 140,000 hospitality industry workers who may be exposed to ETS what the MOSH Act formerly required − protect them, to the greatest feasible extent, against this serious health hazard.

We are not suggesting, of course, that the General Assembly lacks the authority to cut back in this way on the Commissioner's authority to protect the health of these workers.  The General Assembly surely may substitute its public policy judgment about the need to protect these workers for that of the Commissioner.  In so doing, however, the General Assembly will have significantly changed the statutory duties of the Commissioner.

Article XVI, §2 of the Constitution therefore precludes emergency status for this bill.  Instead, it will take effect on June 1, 1995.  Article III, §31 of the Constitution.  *See Allied Am. Mut. Fire Ins. Co. v. Comm'r of Motor Vehicles*, 219 Md. 607, 626, 150 A.2d 421 (1959).

## IV

### Conclusion

In summary, it is our opinion that, because House Bill 1368/Senate Bill 860 may not be given effect as an emergency bill, it will not take effect upon enactment, but instead on June 1, 1995.

J. Joseph Curran, Jr.
*Attorney General*

Jack Schwartz
*Chief Counsel*
 *Opinions & Advice*

---

[11] In light of this conclusion, we need not consider whether House Bill 1368/Senate Bill 860 has changed the duties of the Secretary of Licensing and Regulation.